*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GREGORY LOTT,

        *Petitioner-Appellant,*

    *v.*

MARGARET BAGLEY, Warden,

        *Respondent-Appellee.*

Nos. 05-4336; 07-4294

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
Nos. 95-02642; 04-00822—Kathleen McDonald O'Malley, District Judge.

Argued: June 11, 2008

Decided and Filed: August 8, 2008

Before: BOGGS, Chief Judge; MERRITT and COLE, Circuit Judges.

---

### COUNSEL

**ARGUED:** Gregory W. Meyers, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Sarah A. Hadacek, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Gregory W. Meyers, Melissa J. Callais, Robert K. Lowe, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Sarah A. Hadacek, Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Michael L. Collyer, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

### OPINION

---

MERRITT, Circuit Judge. The present question before us in this habeas corpus, murder case, in which Ohio has imposed the death penalty, is whether the trial and post-conviction evidence would now convince a reasonable factfinder that Lott is innocent of the crime. We agree with District Judge O'Malley that the new evidence of prosecutorial wrongdoing does not undermine the finding of guilt, which means that Lott may not proceed with his otherwise procedurally defaulted claim that the State violated his due process rights by failing to turn over certain "exculpatory" information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Hence, we affirm the judgment for the State.

1

We have written three previous opinions in this case during the last seven years. *Lott v. Coyle*, 261 F.3d 594 (2001); *In re: Gregory Lott*, 366 F.3d 431 (2004); *In re: Gregory Lott*, 424 F.3d 446 (2005). The first opinion recited the gruesome facts and affirmed the denial of Lott's habeas corpus petition on all issues except Lott's actual innocence, "gateway" claim brought under the legal theory set out in *Schlup v. Delo*, 513 U.S. 298 (1995). According to *Schlup*, a petitioner may advance a procedurally defaulted claim if he is able to show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. We did not resolve the *Schlup* issue in our first opinion because we noted that "this issue may now be pending in the state court and has not been fully briefed before us." 261 F.3d 621. In an abundance of caution, given that this is a death penalty case, we addressed this issue in our second opinion and issued an "order authorizing the district court to consider [a] second [habeas] application for a *Brady*, actual innocence, gateway claim." 366 F.3d 431-34. In the third opinion, we resolved an issue regarding the attorney-client privilege raised by Lott "in the midst of litigating his second habeas corpus proceeding" concerning the actual innocence claim.

The issue, as explained in earlier opinions, turns on the application of *Schlup v. Delo* and § 2244(b)(2):

> A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless —
>
> . . . .
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Lott concedes that his legal counsel knew of the facts constituting his *Brady* exculpatory evidence claim by February of 1992. In fact, he admits that his "counsel intentionally committed malpractice by deciding to deliberately bypass Ohio's courts." He explains: "Acting under the old school strategy of 'deliberate bypass,' Baich [Lott's prior counsel] hid this evidence from state courts for fear that he would lose in what was perceived as a hostile forum, hoping instead to play this winning hand in federal court."[1] Petitioner's Brief, *Lott v. Bagley* (filed May 5, 2008). It is difficult to read these statements by Lott's present counsel as anything other than an admission that Lott's previous post-conviction counsel failed to meet the "due diligence" requirement of § 2244.

Even if he were able to meet the due diligence requirement of § 2244, Lott has been unable to advance facts that establish that it is more likely than not that he is actually innocent of the aggravated murder of his aged victim. As a result, he may not advance his procedurally defaulted claim that the State committed a *Brady* violation. In her thorough and comprehensive opinion of September 28, 2007, District Judge O'Malley rejected Lott's gateway actual innocence claim, leaving no stone unturned in her analysis of the facts and the application of the law of procedural default and actual innocence. We attach her findings and conclusions on this issue as Exhibit 1 to this opinion and incorporate them by reference as our reasons for rejecting Lott's *Schlup* actual innocence claim and for affirming the judgment of the District Court. For the full opinion see *Lott v. Bagley*, No. 1:04-CV822, 2007 U.S. Dist. LEXIS 91762 (N. D. Ohio Sept. 28, 2007).

---

[1] For an explanation of the "old school strategy of 'deliberate bypass,'" see *Fay v. Noia*, 372 U.S. 391, 433-40 (1963), overruled in part by *Wainwright v. Sykes*, 433 U.S. 72 (1977).

Accordingly, the judgment of the District Court denying Lott's petition for a writ of habeas corpus is affirmed.

## **EXHIBIT 1**

### 2. *Schlup v. Delo*

Out of an abundance of caution and for appellate review, the Court will, regardless of its findings pertaining to Lott's actual innocence under the statutory standard, also subject his actual innocence claim to the standard set forth in *Schlup v. Delo*, 513 US. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). As the Court reasoned during the evidentiary hearing, this is the standard that Lott must meet to excuse the procedural default of his Brady claims. 14

> 14 Although the issue of whether the *Schlup* standard survived the enactment of the AEDPA was raised during the evidentiary hearing, it is a settled question that Schlup remains intact. *See House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064, 2078, 165 L. Ed. 2d 1 (2006)(*finding Schlup* remains the standard for determining actual innocence in first federal habeas petitions in which the petitioner seeks to excuse the default of those claims based on a showing of actual innocence); *Williams v. Bagley*, 380 F.3d 932, 973-74 (6th Cir. 2004).

In *Schlup v. Delo*, the Supreme Court held that, where a petitioner seeks to utilize claims of actual innocence as a gateway to assert he was wrongly convicted of a crime, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327 (*quoting Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To constitute the necessary "probability," the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* Thus, the Schlup Court concluded, if a habeas petitioner presents evidence of his innocence that is so strong that a habeas court cannot have confidence in the trial's outcome unless it is also of the belief that the trial was free of constitutional error, a habeas petitioner should be entitled to a merit review of his underlying claims. *Id.* at 316.

The Supreme Court revisited the *Schlup* holding in *House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064, 165 L. Ed. 2d 1 (2006). There, the petitioner asserted that multiple facts that had come to light since the time of his state court proceedings could establish his actual innocence as a gateway to excuse the procedural default of the claims raised in the petition. Reversing the Sixth Circuit's denial of this relief, the Supreme Court held that the petitioner had met the *Schlup* standard.

Prior to applying this standard to the facts presented, the *House* Court underscored several aspects of the Schlup holding that are of particular significance here. First, the *House* Court noted that, while *Schlup* requires the introduction of new, credible evidence that was not presented at a petitioner's trial, a habeas court is not limited to such evidence in its actual innocence review. *Id.* at 2077. The *House* Court also emphasized that 'the habeas court must consider 'all the evidence,' old and new, *incriminating and exculpatory*, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *Id. (quoting Schlup*, 513 US. at 327-38)(emphasis supplied).

### B. Substantive Analysis

### 1.28 U.S.C. § 2244(b)

As noted above, the Court must now apply the claim Lott raised in the successor petition to the requirements set forth in § 2244(b). As Lott does not contend that the Supreme Court has created a new rule of constitutional law made retroactive to him under § 2244(b)(2)(A), the Court will review his claim pursuant to § 2244(b)(2)(B). That statute requires Lott to demonstrate both that he could not have previously discovered the factual predicate of his claims, and that he can establish, by clear and convincing evidence, that he would not have been convicted but for constitutional error. 15 The Court reviews each of these statutory prongs, finding that Lott can satisfy neither.

> 15 Although the Court holds elsewhere in this Opinion that Lott has satisfied the diligence requirement of § 2254(e)(2), it notes that the difference in that statute's language from § 2244(b)(2)(B)(i) is significant and requires the Court to perform a distinct analysis. While § 2254(e)(2) merely requires that the petitioner not have "failed to develop" his claims in state court, a requirement Lott clearly has fulfilled by filing a second petition for post-conviction relief, § 2244(b)(2)(B)N requires that an applicant acted *timely* in presenting newly discovered materials to the state courts.

### a. § 2244(b)(2)(B)(1)

Lott's failure to present his *Brady* and actual innocence claims in a timely fashion is undisputable. As Lott concedes in the successor petition, Lott's post-conviction counsel obtained the City of Cleveland and Cuyahoga County Prosecutor's Office records that form the basis of his *Brady* and actual innocence claims by October, 1991. Although Lott could have presented these claims based on this information to the state court at that time, he failed to do so. Current habeas counsel concede that post-conviction counsel "engaged in an 'intentional bypass' of the state courts in the hopes that the federal courts would more thoroughly consider the documents. (Doc. No. 1, at 24). Thus, there is no doubt that Lott fails

to demonstrate that he could not have discovered the factual predicate of his claims previously, as is required under the statute. [16]

> 16 Attempting to circumvent this quandary, Lott's counsel asserted during the evidentiary hearing, as stated above, that "the degree of ineptitude by [post-conviction and first habeas counsel] combined give a legal basis to excuse ... the due diligence default." (Doc. No. 85, at 8). Counsel conceded that this argument currently has no legal support. Id. at 10.
>
> The Court cannot forgive Lott's lack of due diligence because there is simply no authority for what amounts to Lott's ineffective assistance of collateral counsel claim. In fact, the Supreme Court has held explicitly that no such constitutional right exists. *Pennsylvania v. Finley, 481 U.S. 551, 557, 107 S Ct. 1990, 95 L. Ed. 2d 539 (1987); 28 U.S.C. §2254(1).*

### b. § *2244(b)(2)(B)(11)*

Even if Lott could satisfy the requirements of § *2244(b)(2)(B)(i),* he cannot demonstrate, by clear and convincing evidence, that no reasonable factfinder would have convicted him of McGrath's murder if no Brady violation had occurred at his trial. The Court sets forth below the evidence presented at trial and during the federal habeas proceedings.

### i. **Evidence presented at trial**

The Court briefly reviews the most inculpatory evidence the prosecution presented during Lott's trial. The Court acknowledges that the majority of this evidence is circumstantial. The prosecution presented the testimony of several police detectives who stated that a shoe print found in the dusty floor of McGrath's bedroom generally matched a pair of shoes found in Lott's possession. Moreover, the prosecution presented testimony that Lott's fingerprints were on a church envelope that recently had been mailed to McGrath, and another fingerprint matching Lott's was found in McGrath's bedroom. And, the prosecution presented uncontroverted evidence that Lott had been in McGrath's home on prior occasions and was, thus, obviously familiar with the home and with the fact that the home belonged to McGrath.

The only direct evidence linking Lott to McGrath's murder was the testimony of Diedrea Coleman. Coleman identified Lott from a photo array as the man who she had seen driving a Ford Escort, which was later determined to be McGrath's, in her neighborhood. She stated that her suspicions became aroused when she viewed Lott around her neighbor's home. She later observed Lott

departing quickly from that area holding a brown bag or shirt under his arm.

### ii. Materials in support of actual innocence acquired since trial

#### a. Identification Issue

Lott's identification claim contains several sub-parts: First, he maintains that McGrath failed to identify him as the assailant because of his description regarding the complexion, hair, and height of the assailant. Lott also notes from the police report containing this description that McGrath believed that he recognized his assailant from his barbershop. Lott also asserts that Coleman's artist sketch of him and her description of him as having a "reddish" complexion demonstrates his innocence. Moreover, he contends, police suggested to Coleman that Lott altered his skin tone by using skin-lightening makeup.

#### i. McGrath identification

The Court finds that, while parts of McGrath's description of his assailant may support Lott's actual innocence, it by no means proves it by clear and convincing evidence. In his first habeas petition, the Court alternatively held that, even if not defaulted, Lott's claim regarding McGrath's identification of him would not have been well-taken because McGrath's "description is not so contrary to Lott's actual appearance that it would have made a material difference in the outcome of Lott's trial." (Case No. 95 CV 2642, Doc. 109, at 60). Upon review of the evidence and testimony presented during the evidentiary hearing, the Court's conclusion remains unaltered. As stated above, Art McCoy testified during the evidentiary hearing that McGrath frequented his barbershop during the summer of 1986. He stated that McGrath would receive a haircut approximately every two to three weeks. (Doc. No. 85, at 54). Thus, it is fair to assume that McGrath was referring to McCoy's barbershop when mentioning it to the police. McCoy also testified during cross-examination that Lott frequented the area around the barbershop. Id. at 59. He conceded, moreover, that Lott actually entered the barbershop on several occasions. Id. Thus, McGrath's barbershop statement only serves to undermine Lott's innocence claim.

McGrath's physical descriptions of Lott, however, are less clear cut. While the Court, as stated above, finds consistent with its earlier conclusion that McGrath's description does not depart *significantly* from Lott's actual appearance, particularly his description of Lott's height, which varied only two inches from Lott's actual height, the other aspects of the identification present some discrepancies that are inexplicable. Lott's complexion, upon observation, cannot be characterized as "very light," as McGrath described him. Less significant was Lott's hair

length, a physical characteristic which was readily changeable. Kyle testified at the hearing that Lott's hair length remained constantly short throughout the summer of 1986. While the Court does not suspect the veracity of Kyle's recollection, it also is mindful that Kyle's memory of Lott's hair length, a fairly insignificant fact given the events of that summer, could have been mistaken. In sum, the Court finds that the only evidence supporting Lott's actual innocence based on McGrath's identification of him is McGrath's description of his complexion.

Viewing this description in light of the time and condition in which it was received serves to undercut its import, however. Although Detective Copeland testified during the hearing that, pursuant to his typical practice and routine, he would not interview a victim unless lucid, it is undeniable that McGrath's age, and certainly his medical condition at the time of the statement, must be considered when assessing its significance. Along with his physical description of Lott, McGrath also stated during the identical police statement that, "the suspect came back on Monday and let him [McGrath] drive his [own] car." (Doc. No. 17, Exh. B, at 1). He thereafter stated that "he was not sure if this happened or not." Id. These statements hardly inspire confidence that McGrath's description, supplied two sentences later, was accurate. "

> 17 Lott also raised the issue that McGrath failed to identify Lott from the composite sketch created by Coleman. A review of the police report depicting this display reveals, however, that McGrath merely was not responsive when shown the sketch. He died several hours later. (Doc. No. 17, Exh. C). Thus, the Court does not consider this fact to be helpful to Lott.

### ii. Coleman identification

Lott raised the issue of Coleman's identification of him, albeit pursuant to another claim, in his first federal habeas petition. The Court found Coleman's description of Lott, crafted after she had viewed him perusing her neighborhood, to be credible because

> she had a reason to observe him, thus suggesting that she would pay a close degree of attention to his appearance (and would have reason to remember it). The fact that she described Lott as having worn a running suit which was identical to the one found in Lott's car also makes her identification more reliable. Though there are factors, including the apparent differences between Coleman's sketch of the man she saw and Lott's actual appearance, which somewhat weaken the reliability of

> the identification, they do not render the Ohio court's reliability determination unreasonable....

(Case No. 95 CV 2642, Doc. 109, at 65).

Moreover, Coleman's assertion that Lott had a "reddish" complexion is less compelling when taken in the context of her trial testimony. When defense counsel questioned her on cross-examination regarding the "reddish" pigment she described as Lott's skin tone, she elaborated as follows:

> A: Like you have got some black people who have a bluish tone, and some have a yellowish undertone, and some have - - like tannish. You have different shades, variations.

(Trial Tr., at 136). She also admitted that her sketch of Lott was not a "true rendering" of Lott's features, Id. at 131. She stated that she was not attempting to be accurate, instead choosing to prepare a sketch quickly so that police could apprehend the individual. She had expected that a police artist would subsequently enhance the drawing because "they [were] trained in that field," and she was not. Id.

> 18 Lott also raised the issue about whether Lott used skin-lightening makeup to alter his skin tone. As Lott observes, there is nothing in the trial record to support the assertion that Lott ever used skin makeup to alter his complexion. The issue was raised as conjecture during the trial and deposition testimony of Coleman. Lott asserts the Respondent raised this issue to deflect the obvious discrepancy between McGrath's description of his assailant and Lott's actual skin tone.
>
> As Judge Boggs found in his opinion dissenting from the Sixth Circuit's grant of permission to file a second habeas petition, the skin-lightening theory "seems unlikely." *In re Lott, 366 F.3d 431, 437 (6th Cir.* 2004)(Boggs, J., dissenting). Given the fact that the Court already has called McGrath's identification of Lott into question because of his medical condition at the time he provided the description, the Court declines to speculate further on this issue.

### b. Lamp oil issue

During closing arguments at trial, the prosecutor argued that Lott had brought lamp oil with him to McGrath's home, intending to set him afire. The records

post-conviction counsel received in 1991 reveal that, among McGrath's possessions, was a kerosene lamp that would have used lamp oil to be ignited. Lott asserts that the prosecutor's argument that there was no reason for McGrath to have lamp oil in his home was an outright fabrication to prove the element of Lott's intent to kill.

During closing statements, the prosecutor attempted to counter defense counsel's assertions that McGrath may have accidentally ignited himself by arguing as follows:

> The physical examination of his house unquestionably shows aggravated burglary and aggravated robbery as stated in the indictment and the laws of the State of Ohio. But to consider the specific intent that the killer had to kill Mr. McGrath.
>
> I'm not going to even seriously consider those suggestions made by defense counsel concerning the bottle of lamp oil. Nothing in that man's house that uses kerosene or lamp oil. So, with that in mind, consider the intent of the individual who would break into an old man's house, knowing the frailty that age has inflicted on him, bringing with him a cord to tie him up and the lamp oil to burn him.
>
> You may argue that a person that has a gun and kills somebody does it by accident, a knee jerk reaction or a spasm, or for some reason reacted to some fear instilled by the victim.
>
> You cannot but look upon this act as deliberate, vile and specifically intending to cause the death of Mr. McGrath; that he was tied up and that the killer poured this flammable substance on him and ignited him.

Trial Tr. at 778-79.

The Court finds that, while the prosecutor's assertions regarding the lamp oil may be the subject of a prosecutorial misconduct claim, they are immaterial to Lott's claim of actual innocence. As Judge Boggs observed in his dissent from the granting of the application to file a successor petition:

> Assuming that McGrath owned the oil, it was available to Lott, who used it in his attack on the victim. Were this an argument about prosecutorial misconduct in the penalty phase of a capital trial, I would see the relevance. In this context, I cannot draw any inference from the oil that indicates Lott's innocence.

*In re Lott, 366 F.3d 431, 437 (6th Cir. 2004).* Although his opinion is not binding on this Court, the Court finds Judge Boggs's reasoning to be persuasive. Moreover, during the evidentiary hearing, defense counsel Kersey admitted that

he and co-counsel were aware that there was no evidence to support the prosecutor's statement that Lott brought the lamp oil with him. (Doc. No. 85, at 43).

Because Lott was tried before a three judge panel, this Court must assume that the panel was aware of the lack of evidentiary support for the prosecutor's claim. The panel also was well aware that the prosecutor's argument did not constitute evidence during the trial. Thus, Lott is hard pressed to demonstrate that the comment had any effect on the outcome of the trial or has any relevance here. The Court finds that the fact that a kerosene lamp was found in McGrath's home does not tend to demonstrate Loft's actual innocence.

iii. **Loft's confession**

As the *House* Court dictates, this Court must consider all evidence, both inculpating and exculpating, when reviewing an actual innocence claim. *House v. Bell, 126 S.Ct. at 2077; Lott v. Coyle, 261 F.3d at 621.* Thus, while this statement was suppressed before trial and the panel did not consider it because Lott's counsel was not present when it was given, the Court now considers the statement Lott made to Detective James Hughey after his arrest when assessing his actual innocence. The police report containing this statement reads as follows:

> When questioned about the above incident with Mr. John McGrath he started crying. He stated he never intended to hurt Mr. McGrath. He went over to Mr. McGrath's house at 7:00 a.m. sometime in the middle of July and went to the back of the house and broke out a basement window. He went into the house and found Mr. McGrath in a front bedroom on the main floor of the house. He stated that the next thing he knew Mr. McGrath was tied up. He remembers using either a telephone cord or electrical wire to tie him up. McGrath wasn't in bed when this took place but he doesn't remember or know why he wasn't.
>
> After he was tied up he took his car keys which were on a dresser or table ei-

ther in the bedroom or the room next to it and left the house and got into the car, which was in the driveway and drove off with it. He described McGrath's car as being a smaller model car, dark in color.

When asked about any type of flammable [sic] fluid or liquid being put on Mr. McGrath and then setting it on fire he stated that he didn't remember anything about that. He was asked about why he broke into Mr. McGrath's house and why did he tie him up he stated he didn't know why he broke into the house, he didn't want him to contact the police when he left the house with his car....

When questioned about his intent in the McGrath incident he stated he didn't know. He stated he didn't intent [sic] to hurt anyone and that he didn't know what he was doing. He stated that he would do anything to keep from [going] to the [electric] chair.

*Lott v. Coyle, 261 F 3d 594, 620-21 (6th Cir. 2001).*

When reviewing Lott's actual innocence claim on appeal from his first federal habeas petition, the Sixth Circuit found Lott's confession to be significant. Although it initially opined that it was "troubled" that Lott was convicted based solely on circumstantial evidence, the Sixth Circuit reasoned that if Lott's statement ultimately were found to be reliable, it would present the Court with more direct evidence of Lott's guilt. It held, "[a] more detailed review of the circumstances than appears in this record may show that Lott's inculpatory statement, although suppressed at trial, was voluntarily made and admits of no reason to doubt its reliability or truthfulness." *Id. at 621.*

Although Lott now attests that this statement was a complete fabrication, the Court observes both that Lott first made such an assertion in 2002, during his clemency hearing and that Lott presented no evidence at the hearing before this Court which supports that claim. Thus, Lott did not contest the veracity of this statement in any of his prior proceedings and has still yet to do so in any meaningful way.

During a deposition taken during the second habeas proceeding, Lott denied he made any statement regarding his involvement in the McGrath murder. Instead, he maintained that Hughey spoke to him about someone he knew by the name of Freddie Robinson and his brother. (Doc. No. 69, Exh. 2, at 18). Although Lott conceded that he became emotional after being arraigned on mur

der charges, he claims that he never even spoke to Hughey regarding the McGrath murder. Id. at 20.

The Court finds Lott's attack on Hughey's credibility unavailing. Not only is there no evidence in the record that Hughey had any reason to fabricate the confession, the confession itself undercuts any claim that it was fictionalized. First, the absence of reference to an outright admission regarding the arson is telling -- had Hughey invented Lott's words, he would likely have completed the story. Second, details provided in the statement are itself telling -- all being later corroborated by the murder investigation. Lott's confession comports with police testimony stating that the assailant broke in through a basement window, that McGrath was tied up with a telephone cord, and that the assailant left McGrath in the bedroom. Moreover, it substantiates both Coleman's testimony and McGrath's statement that Lott was driving McGrath's car. For these reasons, the Court credits Respondent's assertion that Lott, in fact, provided the above- described confession shortly after the murder.

#### c. Conclusion

In reviewing all the evidence regarding Lott's actual innocence of McGrath's murder, the Court finds, for the reasons stated above, that he falls far short of establishing, as he must to prevail on a successor petition, that he can establish his actual innocence by clear and convincing evidence. Although McGrath's description of Lott's skin tone would tend to exculpate Lott, other evidence Lott maintains proves his actual innocence does not, in fact, do so. Upon further review, some of these materials, such as McGrath's assertion that he knew his assailant from his barbershop, tend to further implicate Lott. Given the circumstantial evidence presented at trial and Lott's confession, the Court finds that Lott fails to meet the standard set forth in § *2244(b)(2)(B)(ii).* Thus, pursuant to that statute, his successor petition must be dismissed.

#### 2. Schlup **v. Delo**

Even if the Court were to disregard the heightened statutory standard of actual innocence, it would find that Lott could not establish his actual innocence pursuant to Schlup. As discussed above, *Schlup* and *House* dictate that, to establish actual innocence, a habeas petitioner must demonstrate that it is "more likely than not, in light of the new evidence, no reasonable juror would find [the petitioner] guilty beyond a reasonable doubt-or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House, 126 S. at 2077.*

As stated above, most of the new evidence Lott presents in support of his innocence does not prove it. The Court found that only the McGrath skin tone description

would support his innocence. All other evidence Lott presented was either neutral, neither establishing nor undercutting his guilt, or tended to inculpate him. This new evidence coupled with the evidence presented at trial and Lott's confession do not establish that it is more likely than not that any reasonable juror, hearing all this evidence, would have reasonable doubt about Lott's guilt. Lott cannot establish his actual innocence pursuant to Schlup. Accordingly, the Court must also find that Lott has failed to establish a "gateway" by which to excuse the procedural default of his Brady claims. Thus, Lott is not entitled to a merit review of them.